**John H. BLOCK, Appellant,**

v.

**Edwin POTTER et al.**

No. 80–1621.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) on July 8, 1980.

Decided Sept. 23, 1980.

As Amended Sept. 30, 1980.

Joel H. Holt, Christiansted, St. Croix, U. S. Virgin Islands, for appellant.

Ive Arlington Swan, Atty. Gen., Robert A. Ellison, Asst. Atty. Gen., Dept. of Law, Christiansted, St. Croix, U. S. Virgin Islands, for appellees.

Before SEITZ, Chief Judge, ADAMS, Circuit Judge, and LORD, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this appeal from the denial of a petition for a writ of habeas corpus, we are asked to review the grounds upon which the Virgin Islands Board of Parole refused to grant John Block's parole application. Specifically, we must determine whether the Board violated Block's rights to due process and equal protection by basing its decision on impermissible considerations. In denying the writ the district court concluded that the Board had applied valid criteria. We reverse.

## I. FACTS

In the spring of 1979 appellant Block was convicted of fraudulent use of a credit card in violation of 14 V.I.C. § 3004 (Supp.1978). He was sentenced to an eighteen month prison term, which is due to expire before the end of this calendar year. Under 5 V.I.C. § 4601 (Supp.1978) a prisoner with a good institutional record becomes eligible

---

* Honorable Joseph S. Lord, III, Chief Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

for parole after serving one–third of his sentence if release is recommended by the warden of the prison and by a psychiatrist. Having satisfied these eligibility standards, Block applied for parole in December, 1979. The Board of Parole denied the application, however, despite its determination that there was no danger that Block would again violate the laws if released. The proffered reason for the denial was that a person like Block who had enjoyed the social advantages of financial security, a college and post–graduate education, and professional employment, should be treated more harshly than the "typical Virgin Islands parole applicant." At the hearing before the district court, the Chairman of the Board of Parole elaborated on these reasons, distinguishing Block from the "typical" applicant on the grounds that he was not black, Puerto Rican, or unskilled.

Block filed a habeas petition in the Virgin Islands district court under 28 U.S.C. § 2255 (1976) and 5 V.I.C. §§ 1301 et seq. (1967).[1] He sought release from custody on the ground that the Board's action constituted an abuse of discretion in contravention of his rights to due process and equal protection. After a hearing, the district court denied the petition, holding that a prisoner's advantageous social background may aggravate the severity of his offense. Reasoning that offense severity is a proper parole consideration because it bears on the goal of deterring future criminal conduct, the court concluded that the Board had based its decision on appropriate criteria. The district court did not address Block's equal protection argument that he had been denied parole because of his race. This appeal followed.

## II. DUE PROCESS

### A. Nature of Appellant's Due Process Interest

In order to assess Block's due process claim, it is important first to recognize that this is not a procedural due process case.

Block does not contend that he has a liberty interest, or entitlement, to parole that must be preserved by imposing procedural safeguards. Instead, Block complains that otherwise satisfactory procedures and standards were applied to him in an arbitrary and impermissible manner.

Thus, the Supreme Court's recent decision in *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), would appear to be no barrier to Block's assertion that his due process rights were violated. In *Greenholtz* the Court held that there is no liberty interest in parole release, derived either from the Constitution or from the mere existence of a discretionary parole system, to which procedural due process protections attach. This holding, however, does not stand for the proposition that once a state decides to provide that which it is not constitutionally compelled to offer, there are no constitutional limitations whatsoever on the basis for making decisions under the program. *See Maher v. Roe*, 432 U.S. 464, 468, 97 S.Ct. 2376, 2379, 53 L.Ed.2d 484 (1977); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). To interpret *Greenholtz* as so holding would be to ascribe to that opinion the intent to initiate a major upheaval in due process jurisprudence. The case, however, does not contravene the time–honored principle that "the touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974); *Dent v. West Virginia*, 129 U.S. 114, 123, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889).

As the Supreme Court emphasized in *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), "[f]or at least a quarter–century [the Supreme] Court has made clear that even though a person has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons,

---

1. Appellant's federal habeas petition should have been brought under § 2241 rather than § 2255, since he is not challenging his sentence.

See *Zannino v. Arnold*, 531 F.2d 687, 689 n. 5 (3d Cir. 1976). Block's claim, however, is cognizable under the Virgin Islands habeas statute.

there are some reasons upon which the government may not rely." *Id.* at 597, 92 S.Ct. at 2697. Thus, as Justice Powell recognized in *Greenholtz*, although "nothing in the Constitution requires a State to provide for probation or parole ... when a State adopts a parole system that applies general standards of eligibility, prisoners justifiably expect that parole will be granted fairly and according to law whenever those standards are met." 442 U.S. at 19, 99 S.Ct. at 2110 (Powell, J., concurring in part and dissenting in part).

The presence of a large measure of discretion in a parole system, such as that in the Virgin Islands, does not alter the fundamental due process limitation against capricious decisionmaking. A legislative grant of discretion does not amount to a license for arbitrary behavior. *Kent v. United States*, 383 U.S. 541, 553, 86 S.Ct. 1045, 1053, 16 L.Ed.2d 84 (1966); *cf. Winsett v. McGinnes*, 617 F.2d 996, 1006 (3d Cir. 1980) (in banc), *petition for cert. filed sub nom. Anderson v. Winsett*, 49 U.S.L.W. 3001 (July 1, 1980) (No. 79–2014) (to be consistent with due process, discretion of prison authorities under Delaware work release program cannot be "absolute" or "unbridled"). Although *Greenholtz* indicates that a state may condition the expectation of parole, or even deny it completely, a state statute may not sanction totally arbitrary parole decisions founded on impermissible criteria.[2] Under the Supremacy Clause, a state statute may not vitiate the fundamental due process right to be free from arbitrary governmental action. See *Meachum v. Fano*, 427 U.S. 215, 230, 96 S.Ct. 2532, 2541, 49 L.Ed.2d 451 (1976) (Stevens, J., dissenting). Thus, *Greenholtz* does not affect the vitality of the numerous cases holding that courts can review the substance of parole decisions, as distinguished from the adequacy of the procedures, to determine whether a parole board exercised its authority arbitrarily. See, e. g., *Zannino v. Arnold*, 531 F.2d 687 (3d Cir. 1976); *Calabro v.*

*United States Board of Parole*, 525 F.2d 660 (5th Cir. 1975); *Clay v. Henderson*, 524 F.2d 921, 924 (5th Cir. 1975); *Childs v. United States Board of Parole*, 511 F.2d 1270 (D.C. Cir.1974). Even if a state statute does not give rise to a liberty interest in parole release under *Greenholtz*, once a state institutes a parole system all prisoners have a liberty interest flowing directly from the due process clause in not being denied parole for arbitrary or constitutionally impermissible reasons. Consequently, in alleging that the Virgin Islands Board of Parole acted arbitrarily by basing its decision on impermissible grounds, we believe that Block has stated a valid due process claim that this Court must resolve.

### B. Standard of Review and Scope of Discretion

The Virgin Islands parole statute confers considerable latitude on the Board of Parole:

> If it appears to the Board of Parole from a report by the proper officers of the penitentiary, prison or jail or upon application by a prisoner for release on parole that there is a reasonable probability that such applicant will live and remain at liberty without violating the laws and if in the opinion of the Board such release is not incompatible with the welfare of society, the Board may, in its discretion, authorize the release of such applicant on parole.

5 V.I.C. § 4604 (Supp.1978). When presented with such a discretionary scheme, the role of judicial review on application for a writ of habeas corpus "is to insure that the Board followed criteria appropriate, rational and consistent with the statute and that its decision is not arbitrary and capricious nor based on impermissible considerations. In other words, the function of judicial review is to determine whether the Board abused its discretion." *Zannino v. Arnold*, 531 F.2d 687, 690 (3d Cir. 1976).

---

**2.** For example, it would not appear appropriate to suggest that the holding in *Greenholtz* gives parole boards a license to deny parole on the basis of race, religion, or political beliefs, or on frivolous criteria with no rational relationship to the purpose of parole such as the color of one's eyes, the school one attended, or the style of one's clothing.

In order to assess whether the Virgin Islands Board of Parole abused its discretion so as to violate Block's right to due process of law, it is necessary to define the scope of their discretion. As a starting point, discretion is always curtailed by the commands of the Constitution. Clearly, the Board would violate due process if it bases a decision on constitutionally impermissible criteria such as race, religion, or the exercise of free speech rights. See *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

The parole statute itself also defines the limits of the Board's discretion. Section 4604 directs the Board to consider whether a prisoner is a likely recidivist and whether release would serve the welfare of society. These criteria must be applied so as to effectuate the purpose and policies underlying the parole system, namely, reintegrating offenders into society and deterring future criminal conduct. See *Greenholtz, supra*, 442 U.S. at 8, 13 99 S.Ct. at 2104, 2106–2107; *Morrissey v. Brewer*, 408 U.S. 471, 477, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484 (1972). When the Parole Board bases its decision on factors that bear no rational relationship to rehabilitation or deterrence, it transgresses the legitimate bounds of its discretion. *Cf. Winsett v. McGinnes, supra*, at 1007 (discretion under prisoners' work release statute must be exercised consistently with the purpose and policy behind work release).

We turn then to an evaluation of the decision of the Virgin Islands Parole Board in light of these standards.

### C. *Analysis of the Parole Board's Decision*

■ The Parole Board minutes explaining the denial of Block's application state that:

In complete contrast to the usual parole candidate presented to the board, this man had a college education and after post graduate training had for some years practiced dentistry in New York. There were no indications of financial want; .... When asked why he should make use of someone else's credit card despite all his advantages, his answer was–and it appeared to be a completely honest answer–"greed." There seemed to be no danger that he would get into trouble again, as far as the Board members could see.

Voted to deny (vote not unanimous). The negative vote was based on the theory that a person who has had so many more advantages in life than those who are usually brought before the Virgin Islands courts and convicted should be dealt with by the Board more harshly than those who are the typical Virgin Islands parole applicants.

At the hearing before the district court the Chairman of the Parole Board elaborated on this explanation, describing the typical parole applicant as black or Puerto Rican, grossly under–educated, unskilled, and unsophisticated. He declared that Block shared none of these characteristics, and then attempted to justify the decision in terms of rehabilitation and deterrence:

The sending of someone to the penitentiary has several serious approaches, ... certainly one of which is rehabilitation, another of which is deterrence; another of which is just simply for some period of time this person will not be ... functioning in open society. And consequently it seemed to us when we considered Mr. Block's circumstances that while we could see nothing in his particular file that we had before us or on the testimony that was adduced before us that Mr. Block had a very high propensity to recommit the crime, we felt it inconsistent with the welfare of the society in general to have Mr. Block be released at that point, because the type of crime he has committed is a crime that does take some sophistication and skill. And to treat him in that same fashion seemed to the Board to be inconsistent with the welfare of society because it certainly would not have the deterrent effect essentially in the community generally.

While I am not suggesting we are judging or being swayed by community pressure, I think we do have a responsibility

to think about what the effects of this particular parole will have on the welfare of the community. And to release him in a rather early fashion on an offense that is quite serious, we didn't think was consistent with what our mandate was from the statute.

■ An examination of these explanations reveals that the Board of Parole distinguished Block from typical applicants on the ground that he was white, indicating that race undoubtedly was a factor in its decision. The conclusion is inescapable that had Block been black or Puerto Rican, the Board would have deemed him a more typical applicant, and thus would not have singled him out for harsher treatment. Race is an impermissible criteria in the parole decisionmaking process, absent the most compelling sort of governmental justification. We cannot conceive of even a rational argument to relate a prisoner's race to the likelihood that he has recidivist propensities. Nor can it rationally be asserted that potential criminals of one race need to be deterred more than those of another. Thus, to the extent that it considered Block's race as a reason for denying his parole application, the Board deprived him of due process.

The dissent argues, however, that the Board's decision can be construed as based primarily on social and economic factors, with race mentioned only as an illustrative response to a question during the hearing. Although we disagree with this interpretation of the record, we are compelled as a result of it to address the propriety of the other factors relied on more explicitly by the Board.

Having found that the interest in rehabilitation was fully satisfied, the Board attempted to relate Block's advantageous social background to the policy of deterrence. The district court accepted this argument, reasoning that Block's individual characteristics augmented the severity of his offense.

■ Offense severity may be a proper parole consideration because it affects the need for deterrence. See *Garcia v. United States Board of Parole*, 557 F.2d 100 (7th Cir. 1977); *deVyver v. Warden*, 388 F.Supp. 1213 (M.D.Pa.1974). In the parole phase of the criminal justice system, however, judgments of offense severity properly may turn only on the nature of the offense, and not on the nature of the offender. Once a parole board considers individual characteristics to heighten offense severity, a parole decision can no longer be justified in terms of a deterrence rationale. The deterrence theory necessarily gives way, because society's interest in deterring criminal activity depends on the harm that such activity inflicts, rather than the particular identity of the perpetrator. Our criminal justice system seeks to deter a certain type or nature of conduct, regardless of the characteristics or motivation of the individual actor. It is therefore irrational and impermissible for a parole board to determine that white, well–educated frauds are inherently more dangerous to society and require stiffer deterrents than black, illiterate frauds.

Under the federal parole scheme, which is the model for the Virgin Islands statute, the severity of an offense is rated according to its type, without regard to the background of the individual offender. Offender characteristics enter into parole evaluations only insofar as they bear on the possibility of recidivism and the need for rehabilitation. See *Geraghty v. United States Parole Commission*, 579 F.2d 238, 254 n.69 (3d Cir. 1978), vacated and remanded on issue of class certification, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).[3] These are the only legitimate bases, it would seem, for considering individual background when making parole decisions.[4] The Virgin

---

**3.** Indeed, the factors that the Board deemed as aggravating are regarded under the federal scheme as mitigating, or, as improving the likelihood of parole release by reducing the danger of recidivism. For a description of the way in which the federal guidelines operate, see *Geraghty, supra*, at 254–59.

**4.** See, e. g., *Zannino v. Arnold*, 531 F.2d 687 (3d Cir. 1976), where the parole board denied Zannino's parole application because of his history of involvement in organized crime activities,

Islands Board of Parole therefore abused its discretion in violation of Block's right to due process when it deemed his offense more severe not because it judged credit card fraud to be an inherently serious transgression, but because it felt that such an act by a well–to–do, well–educated person is more deserving of deterrence than an identical act committed by a less fortunate individual.

When the explanations advanced by the Board of Parole are examined, it is apparent that the Board's decision was rooted in the desire to punish, rather than the need to deter.[5] The retribution rationale is evident from the candid statement in the minutes of the Board's meeting that Block should be dealt with more harshly because of his advantageous background.[6] The Board appears to have made a judgment that because Block should have known better and did admit to greed, his conduct was somehow more opprobrious than an identical act committed by an economically and educationally disadvantaged person. Although virtually all economic crimes are motivated by greed, the Board decided that this warranted harsher treatment for Block, or, in other words, that he should be punished by being incarcerated longer than the typical Virgin Islands offender.

█ Weighing individual characteristics and propensities to make individual judgments about relative culpability is a sentencing function, within the sole province of the judiciary. See *Geraghty v. United States Parole Commission, supra,* at 259–60. To the extent that the Parole Board, an executive authority, was motivated by a retribution rationale in reaching its punitive decision, it invaded the judicial sphere, thus upsetting the delicate balance of the sepa-

---

and because of the "professional" manner in which he committed the offense. Although Zannino challenged only the adequacy of the evidence, and not the reasons for the decision, it was clear that the board's reasons were relevant to the possibility of further criminal activity. A parole board may rationally conclude that a prisoner with organized crime connections, who committed an offense in a way that indecated organized criminal activity, is likely to become reinvolved in such enterprises if released on parole.

5. Testimony at the hearing reveals that the Board may have been more concerned with deterring itself from acting on the basis of sympathy than with deterring future criminal conduct. As the Board Chairman explained, Block was singled out for harsh treatment because:

It has always been a concern of the Board that some members who come up for application for parole are–they are more attractive candidates. They come across more effectively; they appear to be more literate. I think to some extent that various Board members feel that they could sympathize or emphatize [sic] with this person, because they see a lot in that person that they see in themselves. And I think that this is something that we are constantly on. guard to insure that the youngster who comes up before us at, let's say, age 20, 21, or even younger in some cases, who hasn't has his opportunity in life and can't present his case as effectively, and he doesn't immediately draw the sympathy or the emphathy [sic] of the Board, ... that we are going to have to guard against the possibility that we will just simply be sympathizing because, well, this is a professional man and he is not going to do this again, because he has been caught and embarrassed by the whole process.

This explanation highlights the Board's arbitrary departure from established parole standards, because it could have guarded against this understandable human reaction by taking care to treat Block the *same* as less attractive candidates. By going further, however, and consciously dealing with Block more harshly, the Board's action crossed the line between deterrence and punishment.

6. The testimony given by the Board Chairman at the hearing further highlights the punitive motivation underlying the decision to deny parole. For example, the following exchange occurred:

Q. So because of his background, because of the advantages he had in life you felt that he should be treated more harshly. Is that correct?
A. Well, we felt that it was not appropriate that Mr. Block be paroled at this time, that he apply for and be granted parole, because he has had the advantages in life, because it is not consistent with the welfare of society that when somebody who has all of these advantages and then decides nevertheless to take it into his hands to commit a serious crime which is a felony in this jurisdiction then just be quickly released at the very minimum time.

ration of powers.[7] When it singled out Block for harsher treatment solely because of his individual background, the Board was in effect passing sentence upon him for the second time.[8] In doing so, the Board applied standards that are divorced from the policy and purpose of parole, abusing its discretion and violating Block's right to due process of law.

Finally, the Board's attempt to justify its decision as compatible with the welfare of society fails to withstand reasoned analysis. The interest of society in the parole system is served only when applicants are treated with basic fairness, because "fair treatment in parole [decisions] will enhance the chance of rehabilitation by avoiding reactions to arbitrariness." *Morrissey v. Brewer*, 408 U.S. 471, 484, 92 S.Ct. 2593, 2602, 33 L.Ed.2d 484 (1972). In this situation, however, by frankly admitting that it was treating Block more harshly simply because he was white, well–educated, and financially secure, the Board can hardly expect to inculcate respect for the criminal justice system either in Block or in "typical" Virgin Is-

lands parole applicants, who have received an implicit message that they may be treated more favorably at the hands of the law. Any sort of signal to a particular group that the criminal system will accord them harsh or lenient treatment not on the basis of their deeds but solely on the basis of their race, wealth, skills, and learning is not apt to promote respect for the law. Therefore, the Parole Board's decision was incompatible with the welfare of society.

## III. EQUAL PROTECTION

Block also claims that the Parole Board violated his right to the equal protection of the laws insofar as it considered his race as one factor militating against parole release. The dissent suggests that we should not consider this issue but should remand because the district court made no factual findings on the subject. The theory of fact–finding and appellate review espoused by the dissent as justification for further delay has no application to this situation, however. Although an appellate court ordi-

---

7. As this Court cautioned in *Geraghty v. United States Parole Commission*, 579 F.2d 238 (3d Cir. 1978), when

> the parole authority focuses consideration entirely on factors of deterrence, incapacitation and retribution, it takes into account almost exclusively the very factors that are available to the sentencing judge. The Commission then begins to perform functions which are within the traditional province of the judiciary. At least where the prior determinations of the judicial branch are given no weight, therefore, serious questions are raised whether the constitutional protections provided by an independent judiciary are being undermined.

8. It is the function of judges, in imposing sentences, to evaluate offender characteristics as they bear on offense severity, retribution, and deterrence. Sentencing judges also consider parole practices before setting a term of confinement. See S.Rep.No. 605, 95th Cong., 1st Sess. 1169 (1977). Indeed, judges in this Circuit generally assume that if an offender is eligible for parole after serving one–third of the sentence, then an offender with a good institutional record who poses little danger of recidivism will actually be released at that time. They adjust their sentences in accordance with this assumption. See *Addonizio v. United States*, 573 F.2d 147, 153 (3d Cir. 1978), rev. on other grounds, 442 U.S. 178, 99 S.Ct. 2235, 60

L.Ed.2d 805 (1979) (Supreme Court opinion attests to the fact that sentencing judge explicitly considered likelihood of parole); Project, *Parole Release Decisionmaking and the Sentencing Process*, 84 Yale L.J. 810, 882 n.361 (1975). The judge who sentenced Block undoubtedly considered both Block's background and the likelihood of parole in assessing the length of incarceration necessary to punish someone who should have known better in light of his advantageous background and to deter the fraudulent use of credit cards. By making its own determination of the length of imprisonment appropriate to exact retribution against Block, the Board of Parole intruded on the sentencing function. As Judge Aldisert stated in *Addonizio*, where "the very 'nature and circumstances of the offense' which generated a deliberate imposition of a [certain] penalty are now being used by the Parole Commission to deny the parole which was anticipated in the imposition of the original penalty[,] [t]raditional standards of criminal justice reject this apparent double punishment for the same factor– one punishment imposed by the sentencing court, the other by the Parole Commission." 573 F.2d at 155, rev. on other grounds, 442 U.S. 178 (1979). *Cf.* Yale Project, supra, at 892–93 (when parole boards second guess judicial evaluation of offense severity, they thwart or even nullify the sentencing process).

narily may not make independent factual findings, this does not preclude us from resolving appellant's equal protection claim. The issue whether a particular decision was based on considerations of race is more properly characterized as an ultimate legal conclusion to be drawn from a factual record, or at most as a mixed question of law and fact. It is an established principle of appellate review that we are not bound by a lower court's "conclusions which are but legal inferences from facts." *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 267 (3d Cir.), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1690, 26 L.Ed.2d 64 (1970) (applying this principle, this Court drew its own conclusion, differing from that of the district court, on whether a wage differential was based on factors other than sex). As Justice Frankfurter stated, "the conclusion that may appropriately be drawn from the whole mass of evidence is not always the ascertainment of the kind of 'fact' that precludes considerations by [an appellate court]." *Baumgarten v. United States*, 322 U.S. 665, 671, 64 S.Ct. 1240, 1244, 88 L.Ed. 1525 (1944). It is especially permissible for an appellate court to make its own determination when, as here, the mixed question is one of constitutional significance. The Supreme Court has consistently recognized that "in cases involving asserted violations of constitutional rights a reviewing court is free to draw its own inferences from established facts." *Beck v. Ohio*, 379 U.S. 89, 100, 85 S.Ct. 223, 230, 13 L.Ed.2d 142 (1964) (opinion of Harlan, J.); *Ker v. California*, 374 U.S. 23, 33–34, 83 S.Ct. 1623, 1629–1630, 10 L.Ed.2d 726 (1963). It is therefore appropriate for this Court to review the record, which consists solely of undisputed statements and documents, to determine whether the Parole Board violated Block's right to the equal protection of the laws.[9]

From the record before us it is evident that the Board considered Block's race as one factor warranting harsher treatment for him than for the "typical" black or Puerto Rican parole applicant. The dissent again argues for a remand on this point, contending that it is not clear from the record to what extent race was a factor in the decision. The record plainly reveals, however, that the Board did cite Block's race as a distinguishing characteristic in explaining its decision. The equal protection clause forbids government bodies from making decisions on the basis of race, even if other factors were also considered. The use of racial criteria taints the entire action.

We therefore find that by relying on Block's race as one factor supporting the denial of his parole application, the Board violated Block's right to the equal protection of the laws. Absent a compelling governmental interest, the equal protection clause forbids different treatment of similarly situated individuals on the basis of race. It is not possible to conceive of even a rational relationship between the race of an offender and either the purposes of parole, the severity of the offense, the need for deterrence, or the prospects for rehabilitation. Nor is there any history of past discrimination against "typical" black or Puerto Rican parole applicants that would justify treating a white applicant more strictly. *Cf. University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). The Parole Board's purported interest in avoiding the appearance of favoritism toward advantaged, "sympathetic" applicants such as Block[10] could have been effectuated simply by treating Block the same as black and Puerto Rican applicants.

## IV. CONCLUSION

The Virgin Islands Board of Parole denied John Block's application for parole on the basis of arbitrary and impermissible criteria bearing no relationship to the pur-

---

**9.** A further reason for reaching this issue now is that a remand in this situation would frustrate the interests of justice. Further proceedings would consume several months, by which time Block's sentence will have expired. As a result, he would be completely denied an opportunity for parole, and his claim that his constitutional rights were violated would go unreviewed and unredressed.

**10.** See note 5 *supra*.

poses of a parole system. The Board therefore violated Block's fundamental due process right to be free from arbitrary governmental action, as well as his right to the equal protection of the law. The judgment of the district court accordingly will be reversed.[11]

SEITZ, Chief Judge, dissenting.

I cannot join the majority for several reasons. First, I would dismiss Block's due process claims because prisoners do not have a sufficient liberty interest in parole merely because the state has created a discretionary parole system, and the Virgin Islands Parole Statute, 5 V.I.C. § 4604 (1967), does not create a legitimate expectation of parole under *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). Second, although I fully agree that race is an impermissible basis for parole denial, the district court did not address this question and it is unclear from the record whether race was a mere descriptive reference or a basis for the denial. Assuming that race was not a significant factor, I would uphold the Board's parole decision because the Board properly may consider society's need to hold the criminal accountable for his conduct under section 4604, and its decision that an economic crime by someone of Block's advantageous background was more reprehensible than an economic crime by a poor, uneducated person was rational and therefore does not violate the equal protection clause. Finally, because it is not the role of the courts of appeals to make independent findings of fact, at least in the present context, I would remand for a determination of whether race was a significant factor in the Board's decision to deny Block's parole application.

I.

Due process protections apply when government action deprives a person of a liberty or property interest. To obtain such a protectible interest:

a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The proper initial inquiry then, is whether Block has a liberty interest in parole.

In *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the Supreme Court held that there is no inherent constitutional right to be released on parole. It also held that the mere existence of a state parole system that establishes the possibility of parole does not create a liberty interest. However, it recognized that the language of a parole statute itself could create a protected liberty interest.

The Nebraska statute involved in *Greenholtz* stated that the Board of Parole "shall" order a prisoner's release on parole unless one of four specified disqualifying factors was found to exist.[1] The Court concluded that this statute created a legitimate expectation of parole and that state prisoners were entitled to some measure of due process protection. It emphasized that "this statute has unique structure and language and thus whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis." *Id.* at 12, 99 S.Ct. at 2106.

---

11. On the day this opinion was filed the Court was advised that Block had been released on parole.

1. The statute provided in relevant part that: Whenever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it shall order his release unless it is of the opinion that his release should be deferred because:

(a) There is a substantial risk that he will not conform to the conditions of parole;

(b) His release would depreciate the seriousness of his crime or promote disrespect for law;

(c) His release would have a substantially adverse effect on institutional discipline; or

(d) His continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance his capacity to lead a law-abiding life when released at a later date.

Neb.Rev.Stat. § 83-1, 114 (1976).

Parole release decisions in the Virgin Islands are governed by 5 V.I.C. § 4604 (1967). That statute provides that if it appears to the Board:

> that there is a reasonable probability that [a parole] applicant will live and remain at liberty without violating the laws and if in the opinion of the Board such release is not incompatible with the welfare of society, *the Board may, in its discretion,* authorize the release of such applicant on parole. (emphasis supplied).

Thus the statute leaves parole decisions to the discretion of the Board, and, unlike the statute in *Greenholtz*, section 4604 does not require that the Board grant parole unless specified conditions are present. Nothing in the broad language of section 4604 creates a "legitimate claim of entitlement" to parole. *Cf. Wagner v. Gilligan,* 609 F.2d 866 (6th Cir. 1979) (per curiam) (no liberty interest created by Ohio statute under which parole authority may grant parole if, in its discretion, it determines that parole would further the interests of justice and be consistent with the welfare and security of society).

Nor are there other factors present in this case that create a liberty interest. In our recent decision in *Winsett v. McGinnes,* 617 F.2d 996 (3d Cir. 1980) (en banc), *petition for cert. filed sub nom. Anderson v. Winsett,* 49 U.S.L.W. 3001 (July 1, 1980) (No. 79–2014), the work release statute left much discretion to prison officials and did not itself create a liberty interest. We nevertheless found a protectible interest in part because work release regulations promulgated by the Delaware Department of Corrections limited the Department's discretion under the statute.

There are, however, no such limiting regulations in this case. Indeed, we are advised that the Board has adopted no regulations whatsoever. We have only a statute that leaves parole decisions to the discretion of the Board, which must make a difficult judgment as to whether a prisoner's release will be compatible with the welfare of society.

Absent any formal regulations that narrow the exercise of the Board's discretion, section 4604 does not create a legitimate claim of entitlement to parole and Block therefore does not have a liberty interest in parole to which due process protections attach. This conclusion is supported by a number of decisions since *Greenholtz* that have held that similar state statutes that leave parole decisions to the discretion of the parole authorities do not create protectible liberty interests. *See, e. g., Boothe v. Hammock,* 605 F.2d 661 (2d Cir. 1979); *Shirley v. Chestnut,* 603 F.2d 805 (10th Cir. 1979) (per curiam). Accordingly, I would hold that the district court properly denied relief on Block's due process claim.

Although the majority opinion appears to agree that Block does not have a liberty interest in parole release under *Greenholtz,* it attempts to distinguish *Greenholtz* by limiting it to procedural due process claims, and then purports to find that "all prisoners have a liberty interest *flowing directly from the due process clause* in not being denied parole for arbitrary or constitutionally impermissible reasons." (emphasis added). The infirmities in the majority's due process analysis are several.

First, the majority finds *Greenholtz* inapplicable because Block does not request procedural safeguards. In holding that this is not a procedural due process case, the majority presumably analyzes it under substantive due process. This distinction, however, does not advance the analysis. The due process clause prohibits the government from arbitrarily depriving a person of a protected interest, either by requiring that certain procedural protections be provided to protect that interest, or, by providing for review of the government action that significantly impinges on that interest to ensure that it is not arbitrary. Characterizing Block's claim that his parole denial violated the due process clause as substantive does not vitiate the need to identify a liberty interest sufficient to implicate due process protection. *Cf. Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (finding that freedom of personal choice in matters of marriage and

family life is a liberty protected by the due process clause). Therefore the holding in *Greenholtz* that prisoners do not have a liberty interest in parole merely because the state has created a parole system applies to this case whether the claimed due process violation is procedural or substantive.

Second, the conclusion reached by the majority that all prisoners have a liberty interest not to be treated arbitrarily by the government in effect avoids the requirement that a court first must identify the interest toward which the government has acted arbitrarily when it reviews a due process claim. Because *Greenholtz* held that prisoners have no liberty interest in parole unless the parole statute itself creates a legitimate expectation of parole and the Virgin Islands statute creates no such expectation, the majority in effect is concluding that any arbitrary action by the government creates the liberty interest itself. This conclusion strips the words "life, liberty or property" in the fifth amendment of any independent meaning and also completely undercuts the Supreme Court's analysis in *Greenholtz*.

I agree with the majority's assertion that a discretionary parole system which creates no legitimate expectation of parole does not give the state the unfettered right to deny parole on arbitrary and impermissible grounds. However, the constitutionality of the grounds on which the parole board relies should be analyzed under other provisions of the Constitution and not the due process clause. For example, prisoners are protected from the arbitrary denial of parole based on "frivolous criteria with no rationale relationship to the purpose of parole," or otherwise impermissible classifications such as race, by the equal protection clause. Prisoners are protected from parole denial based on their religious or political beliefs by the first amendment. This is the constitutional protection to which the Supreme Court was referring in the cases relied on by the majority. As the majority notes, in *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1973), the Court stated that "even though a person has no 'right' to a valuable govern-

ment benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." The Court held in *Perry* that lack of a tenure right does not defeat a teacher's claim that the nonrenewal of his contract violated his right to free speech under the first amendment, and that the teacher's claim of a *de facto* tenure policy entitled him to an opportunity to prove the legitimacy of his claim to a property interest in job tenure. Therefore, neither *Perry* nor any of the other cases relied on by the majority support the proposition that due process protection attaches whenever there is arbitrary action by the government without first determining that there is a protected liberty or property interest. Because Block had no liberty interest in parole release, I would dismiss his due process claims and analyze the Parole Board's decision under the equal protection clause.

## II.

The Board admits that it denied Block's parole application because it concluded that a person with Block's advantageous background should be treated more harshly than the typical Virgin Islands parole applicant. Block asserts that this differential treatment violated the equal protection clause of the fourteenth amendment.

The minutes of the Board meeting at which Block's application was considered state:

In complete contrast to the usual parole candidate presented to the Board, this man had a college education and after post–graduate training had for some years [practiced dentistry] in New York. There were no indications of financial want: . : . When asked why he should make use of someone else's credit card despite all his advantages, his answer was–and it appeared to be a completely honest answer–"greed." There seemed to be no danger that he would get into trouble again, as far as the Board members could see.

Voted to deny (vote not unanimous). The negative vote was based on the theory that a person who has had so many more advantages in life than those who are usually brought before the Virgin Islands courts and convicted should be dealt with by the Board more harshly than those who are the typical Virgin Islands parole applicants.

At the district court's hearing on Block's habeas corpus petition, Frederick G. Watts, the Chairman of the Virgin Islands Board of Parole, explained the Board's decision. Initially, counsel for Block asked Watts to describe the typical Virgin Islands parole applicant against whom Block had been contrasted. He responded that:

they are typically black or Puerto Rican; they are typically grossly under–educated. They are also typically unskilled in terms of work skills to any large extent, at least relatively unsophisticated people.

Watts admitted that Block is not black or Puerto Rican, not undereducated, and not unskilled or unsophisticated. He then justified the denial of Block's parole application on the ground that:

it is not consistent with the welfare of society that when somebody who has all of these advantages and then decide[s] nevertheless to take it into his hands to commit a serious crime which is a felony in this jurisdiction then just be quickly released at the very minimum time.

Although Block's ethnic background was alluded to in the district court by Watts as a factor distinguishing him from the typical Virgin Islands parole applicant, the district court did not address whether race as such was relied on by the Board in rendering its decision. Moreover, it is unclear from this record whether Block's race or ethnic background as such rather than his general social and economic background was relied on by the Board to deny his parole. Because classifications based on race receive greater protection under the equal protection clause than economic classifications, I will first address the equal protection claim as though race was not a factor.

A.

Assuming that Block's race or ethnic background was not a significant factor in the Board's decision, the task in deciding his equal protection claim is to determine whether the Board had a rational basis for denying his parole application because of his advantageous social and economic background. *See Dandridge v. Williams*, 397 U.S. 471, 485–86, 90 S.Ct. 1153, 1161–1162, 25 L.Ed.2d 491 (1970). I agree with the majority's analysis of general deterrence. I also agree with the majority's conclusion that the Board's decision "was rooted in the desire to punish" or retribution. I part company with the majority, however, when it concludes that retribution is an improper criterion for the Parole Board to consider because it is "within the sole province of the judiciary." Without commenting on the desirability of the use of retribution as a criterion at the parole release stage, I think that it is within the authority of the Virgin Islands Parole Board to consider this rationale.

Section 4604 directs the Board to consider both whether an eligible prisoner is likely to violate the law if released *and* whether his release "is not incompatible with the welfare of society." Thus the Board must consider not only the prisoner's rehabilitation but also the effect of his release on the community as a whole. This latter factor makes concepts of general deterrence and retribution appropriate components of the parole decision. *See Rankin v. Christian*, 10 V.I. 455, 376 F.Supp. 1258 (D.V.I.1974) (parole denial under section 4604 because of need for general deterrence of drug offenses does not violate equal protection).

Although the federal parole statute does not control the disposition of this case, as the majority notes, it "is the model for the Virgin Islands statute." The legislative history of this Act specifically enumerates retribution as a proper criterion for a Parole Board to consider when deciding on a parole application. For example, the Senate Report provides:

*Parole is an extension of the sentencing process . . . . The final determination of*

precisely how much time an offender must serve is made by the parole authority. The parole agency *must weigh several complex factors in making its decision, not all of which are necessarily complementary.* In the first instance, parole has the practical effect of balancing differences in sentencing policies and practices between judges and courts.... [T]he parole authority *must have in mind some notion of the appropriate range of time for an offense which will satisfy the legitimate needs of society to hold the offender accountable for his own acts.* S.Rep.No.94–369, 94th Cong., 2d Sess., 15–16, 1976 U.S.Cong. & Admin.News, pp. 335, 337. The House Conference Report also provides:

Determinations of just punishment are part of the parole process and these determinations cannot be easily made because they require an even–handed sense of justice. There is no body of competent empirical knowledge upon which parole decision–makers can rely, yet it is important for the parole process to achieve an aura of fairness by *basing determinations of just punishment on comparable periods of incarceration for similar offenses committed under similar circumstances.* The parole decision–makers *must weigh the concepts of general and special deterrence, retribution and punishment,* all of which are matters of judgment....

H.Con.Rep.No.94–838, 94th Cong., 2d Sess. 25–26, 1976 U.S.Cong. & Admin.News, p. 358. *See also Shepard v. Taylor,* 556 F.2d 648 (2d Cir. 1977) (under federal parole statute, determinations of just punishment are part of the parole process, and Parole Commission must weigh concepts of general deterrence and retribution).

Punishment is imposed on a criminal offender for purposes of retribution to condemn his conduct and to vindicate or reaffirm community norms and values. *See generally* S. Kadish & M. Paulsen, Criminal Law & Its Processes 6–21 (1975). Under this rationale, certain conduct that violates a criminal statute may constitute a greater affront to the societal values protected by

the statute than the typical violation and therefore may merit more severe punishment. While such considerations generally are relevant to the decision of the sentencing judge, in view of the broad language of section 4604, I think that it is also permissible for the Board to consider these retribution principles at the parole stage.

The Board found that Block committed an economic offense, fraudulent use of a credit card, solely because of greed. In the case of the typical and less fortunate Virgin Islands parole applicant described above, commission of this economic offense reasonably might evoke some sympathetic understanding. However, Block's background displays none of the social and economic disadvantages that might mitigate such an offense or make his conduct less reprehensible.

Under these circumstances, I think that it was permissible for the Board to consider Block's conduct in committing this particular offense to be more serious than similar conduct by a typical Virgin Islands parole applicant and that consequently, the community had a greater need to hold Block accountable for this crime. *See Albano v. Anderson,* 472 F.Supp. 931 (M.D.Pa.1979). Therefore, this concern constituted a rational basis for the Board's reliance on Block's advantageous social and economic background in denying his parole application, and denial of parole on this basis does not violate the equal protection clause.

### B.

If, contrary to my assumption in the above section, the Board did base its decision on the fact that Block was white, this basis deserves greater scrutiny under the equal protection clause. Whether the standard of scrutiny is couched in terms of strict scrutiny or some lesser standard, *see University of California Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), I do not think that the Board's interest in retribution would permit it to deny parole because of race.

I therefore agree with the majority that race is an impermissible criterion for the

Board to consider, but unlike the majority, I do think that it is the proper function of this court to make independent findings of fact on appeal, at least in the present context. Because the district court did not address, and the record is unclear, to what extent, if any, Block's race or ethnic background may have been a factor in the Board's decision, I would remand this case to the district court for a forthwith hearing and determination as to whether race was a significant factor. Such an order would answer the majority's concern that because Block's term soon will expire, his constitutional rights will go unredressed. In any event, contrary to the suggestion in the majority opinion, I do not believe that the need for expedition justifies deviation from established fact–finding procedures.